# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 25-CR-4031-LTS-KEM |
| vs. | **REPORT AND RECOMMENDATION** |
| MARTIN GODBERSEN, | |
| Defendant. | |

Defendant Martin Godbersen moves to suppress evidence seized from his person and vehicle after a pretextual traffic stop. Doc. 33. He argues that law enforcement lacked reasonable suspicion for the initial stop and to conduct a *Terry*[1] frisk of his person. The Government resists, arguing that reasonable suspicion existed and that the inevitable-discovery doctrine applies to save the frisk in the alternative. Doc. 36.

I held an evidentiary hearing on August 11, 2025. Doc. 40. At the hearing, the following witnesses testified:

- Drug Enforcement Agency (DEA) Task Force Officer (TFO) John Howard; and
- Iowa State Trooper Samuel Magana Cisneros.

I also admitted the following exhibits into evidence:

- Exhibit A (Doc. 33-2) – Body camera footage from Trooper Magana Cisneros;
- Exhibit B (Doc. 33-3) – Dash camera footage from Trooper Magana Cisneros's patrol vehicle;
- Exhibit C (Doc. 33-4) – Body camera footage from Woodbury County Sheriff's Office Sergeant Michael Simoni conducting K-9 sniff;
- Exhibit D (Doc. 33-5) – Body camera footage from Sergeant Simoni of *Terry* frisk; and
- Exhibit E (Doc. 33-6) – Audio recording of interrogation of Godbersen.

---

[1] ***Terry v. Ohio***, 392 U.S. 1 (1968).

I recommend **denying** the motion to suppress.

## I. BACKGROUND[2]

Prior to the day of the traffic stop, the DEA was investigating Godbersen for drug-trafficking activities. A confidential informant identified Paulette Allen as someone with connections to methamphetamine. Through Allen's contacts, the confidential informant purchased methamphetamine from Donald Most on April 1 and April 10, 2025, via controlled buys at Most's residence. During these controlled buys, Allen and Most identified "Marty" as their methamphetamine supplier, and the confidential informant saw Godbersen arrive at Most's residence during the drug transactions.

The confidential informant told the DEA that another purchase would occur at Most's residence on April 22, 2025. DEA agents held a briefing with officers from other agencies, where they relayed what they knew about the prior controlled buys and their belief that Godbersen was the source of methamphetamine. Law enforcement planned to conduct surveillance of Most's house and Godbersen.

Through his surveillance, TFO Howard saw Godbersen arrive at Most's residence on April 22 and sit outside in his vehicle for several minutes on his phone. Godbersen ultimately left without making contact with anyone inside the residence. TFO Howard followed Godbersen in his unmarked vehicle. Godbersen drove down Hamilton Boulevard, a street with two lanes for each direction of traffic and lined with several businesses, including a Hy-Vee grocery store and fast-food restaurants. TFO Howard followed Godbersen from the residence and southbound on Hamilton. He followed behind Godbersen and then moved and drove parallel to him. He testified that he kept pace with Godbersen, driving at the same rate of speed, and saw via his own certified

---

[2] The facts in the background section are taken from the testimony at the suppression hearing unless otherwise noted. The court also notes its general familiarity with Hamilton Boulevard in Sioux City, Iowa.

speedometer that Godbersen was speeding. TFO Howard also testified that when he drove next to Godbersen, he saw that Godbersen appeared to be texting while driving—he wore "cheaters" reading glasses, holding his phone out in front of him while he moved his thumbs.

During the surveillance, Trooper Magana Cisneros waited in his marked patrol vehicle in the Hy-Vee parking lot at 28th and Hamilton. He testified that Sergeant Simoni communicated via the radio that his radar showed Godbersen driving 41 miles per hour in a 35 mile per hour zone.[3] Shortly thereafter, Trooper Magana Cisneros saw Godbersen drive by his location, and Trooper Magana Cisneros began to follow him. He testified that he heard TFO Howard say on the radio that Godbersen was texting, and Trooper Magana Cisneros could also see in Godbersen's side mirror that Godbersen's head was looking down at his lap. Video from Trooper Magana Cisneros's vehicle shows Godbersen driving close to the left side of the lane, then drift to the right side of the lane before going to the middle of the lane. Ex. B, 0:00-0:25. Trooper Magana Cisneros initiated a traffic stop of Godbersen. Sergeant Simoni and other officers arrived on the scene shortly thereafter.

Trooper Magana Cisneros told Godbersen that he stopped him because he was on his phone. Ex. A, 1:50. He said it looked like Godbersen was texting and pointed out that it took him a while to pull over.[4] *Id.*, 2:15. Trooper Magana Cisneros directed Godbersen out of the car so that he could sit in the patrol vehicle while Trooper Magana Cisneros prepared a warning. *Id.*, 2:30. Trooper Magana Cisneros and Sergeant Simoni conducted a *Terry* pat down of Godbersen for weapons. *Id.*, 3:10; Ex. D. Trooper Magana Cisneros stated he felt a rocky, crystalline substance in Godbersen's left pocket,

---

[3] TFO Howard also testified that he heard this radio communication.

[4] Video from Trooper Magana Cisneros's vehicle shows the time from when Godbersen applied his brakes until he pulled over, during which time he drove across a bridge with no shoulder. Ex. B, 00:45-1:24.

3

so he placed Godbersen in handcuffs prior to placing him in the front seat of the patrol vehicle. *Ex. A*, 3:50.

In the patrol vehicle, Troper Magana Cisneros and Godbersen continued to discuss whether he had been on his phone while driving. *Id.*, 5:30-6:30. Godbersen denied texting, but Trooper Magana Cisneros said he knew he was texting because somebody watched Godbersen on his phone texting. *Id.* Trooper Magana Cisneros asked Godbersen if they looked at his phone, would it not show recent messages? *Id.* Godbersen said he had been texting twenty minutes ago but not while driving. *Id.* Trooper Magana Cisneros said he was on his phone "like this pretty hard," and mimicked holding a phone out in front of his body. *Id.*

Later, Godbersen asked if he had really been pulled over for texting. *Id.*, 8:12. Trooper Magana Cisneros said he had been pulled over for texting and speeding. *Id.* Godbersen replied that he was cruising the same speed as everyone else. *Id.*, 8:21. Trooper Magana Cisneros said he was driving pretty slowly because he was texting. *Id.* Godbersen asked how he could have been speeding if he was driving slowly. *Id.*, 8:28. Trooper Magana Cisneros said that when he was texting, he drove slowly, but before that, when he first entered Hamilton from Stone Park[5] Boulevard, he had been speeding. *Id.* Trooper Magana Cisneros said he saw Godbersen texting and another officer saw him speeding. *Id.*, 11:34. Trooper Magana Cisneros exited the vehicle and asked Deputy Simoni how fast he had clocked Godbersen driving, and Deputy Simoni said Godbersen was driving 41 in a 35-mile-per-hour zone. *Id.*, 11:45.

---

[5] TFO Howard testified he followed Godbersen from "Stone" to around 13th Street, and Trooper Magana Cisneros referred to "Stone" on the video, and both appear to be referring to Stone Park Boulevard. The court is aware that Stone Park Boulevard is further north from the Hy-Vee where Trooper Magana Cisneros had waited, and that Stone Avenue is on the other side of Sioux City, to the east.

Law enforcement ultimately moved Godbersen's car (stopped on the busy street) to a parking lot to conduct a K-9 sniff. The K-9 alerted to the vehicle, and a search of the vehicle and Godbersen's person revealed methamphetamine.

## II. DISCUSSION

### A. Initial Stop

The Fourth Amendment protects people "against unreasonable searches and seizures."[6] "A traffic stop is a seizure and 'must be supported by reasonable suspicion or probable cause.'"[7]

> "A reasonable suspicion is a 'particularized and objective' basis for suspecting criminal activity by the person who is stopped." Reasonable suspicion is determined by "looking at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing based on his own experience and specialized training to make inferences from and deductions about the cumulative information available." "Reasonable suspicion must be supported by more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard."[8]

"A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."[9] The Fourth Amendment does not prohibit pretextual stops; as long as an officer has "reasonable suspicion or probable cause to stop for a traffic violation,

---

[6] **U.S. Const. amend IV**.

[7] *United States v. Martin*, 15 F.4th 878, 881 (8th Cir. 2021) (quoting *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008)).

[8] *Id.* at 882 (cleaned up) (quoting *United States v. Bustos-Torres*, 396 F.3d 935, 942 (8th Cir. 2005); *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Roberts*, 787 F.3d 1204, 1209 (8th Cir. 2015)).

[9] *United States v. Sanchez,* 572 F.3d 475, 479 (8th Cir. 2009) (quoting *Arvizu*, 534 U.S. at 277).

'any ulterior motivation on the officer's part is irrelevant.'"[10] "The collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers."[11] The Government bears the burden of proof.[12]

I credit Trooper Magana Cisneros's testimony that he pulled Godbersen over based on Sergeant Simoni's and TFO Howard's radio communications that Godbersen was speeding and texting while driving. Under the collective knowledge doctrine, Trooper Magana Cisneros had reasonable suspicion that Godbersen violated Iowa's traffic laws,[13] even if he did not personally observe the infractions.[14] Defendant questions Trooper Magana Cisneros's credibility, noting the video evidence shows he made inconsistent statements to Godbersen during the traffic stop (by failing to tell Godbersen initially that he had been pulled over for speeding; by being unclear whether he personally or someone else saw Godbersen texting; and by saying Godbersen was driving slowly and then saying he was speeding). Trooper Magana Cisneros explained both during the traffic stop and at the hearing that law enforcement clocked Godbersen speeding when he first turned onto Hamilton Boulevard, then as he drove south down Hamilton, his speed slowed and

---

[10] *United States v. McLemore*, 887 F.3d 861, 864 (8th Cir. 2018) (quoting *United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016)).

[11] *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008).

[12] *United States v. Adler*, 590 F.3d 581, 583 (8th Cir. 2009).

[13] **Iowa Code § 321.276(2)** (2024) ("A person shall not use a hand-held electronic communication device to write, send, or view an electronic message while driving a motor vehicle unless the motor vehicle is at a complete stop off the traveled portion of the roadway," but this section does not apply to "[a] person receiving safety-related information including emergency, traffic, or weather alerts," and also does not prohibit "using a global positioning system or navigation system or . . . select[ing] or enter[ing] a telephone number or name in a hand-held mobile telephone" to place a call); *Id.* **§ 321.285** (speed restrictions).

[14] I found Trooper Magana Cisneros credible, including his testimony about personally observing Godbersen looking down and appearing to be checking his phone while driving.

officers observed him on his phone. Trooper Magana Cisneros's actions during the traffic stop are consistent with not wanting to let the target of a drug investigation know he was under surveillance or that a confidential informant was working with law enforcement.

I recommend holding that reasonable suspicion supported the initial stop.

### B. Terry Frisk

"During a valid stop, officers may conduct a protective pat-down search for weapons to ensure officer safety if they have objectively reasonable suspicion that a person might be armed and dangerous."[15] Because firearms are often used by drug dealers, the Eighth Circuit has held that "reasonable suspicion that [a suspect is] involved in drug trafficking . . . on its own justifie[s a] protective pat-down" search.[16]

Here, law enforcement had reasonable suspicion that Godbersen was involved in drug trafficking based on the two previous controlled buys conducted at Most's residence, information from the confidential informant that Godbersen was the source of methamphetamine for the controlled buys, and Godbersen appearing outside Most's residence during the time the confidential informant said another methamphetamine sale would occur (even though Godbersen ultimately left without supplying any drugs). Defendant argues TFO Howard knew Godbersen had prior drug-trafficking convictions, but no prior convictions involving firearms. Thus, Defendant argues officers lacked reasonable suspicion to conduct a *Terry* pat-down. Eighth Circuit caselaw is clear that a

---

[15] *United States v. Austin*, 104 F.4th 695, 699 (8th Cir. 2024).

[16] *United States v. Stigler*, 574 F.3d 1008, 1010 (8th Cir. 2009); *accord* **United States v. Bustos-Torres**, 396 F.3d 935, 943 (8th Cir. 2005) ("Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction."); **United States v. Steffens**, 418 F. Supp. 3d 337, 365 (N.D. Iowa 2019) ("The officers were also justified in conducting a pat-down search of [defendant], because they received information that [his] warrant was related to drugs and there is a tendency among drug criminals to possess firearms."), *aff'd sub nom.* **United States v. Lillich**, 6 F.4th 869 (8th Cir. 2021).

reasonable suspicion a suspect is involved in drug trafficking provides a reasonable suspicion the suspect may be armed and dangerous for purposes of conducting a *Terry* frisk.

I recommend holding that the *Terry* frisk was supported by reasonable suspicion.[17]

### III. CONCLUSION

I recommend **DENYING** Godbersen's motion to suppress (Doc. 33).

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections.[18] Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[19] Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[20]

**DATED** August 14, 2025.

_____
Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

---

[17] Based on this recommendation, I need not address the Government's inevitable-discovery argument.

[18] **LCrR 59**.

[19] *See* **Fed. R. Crim. P. 59**.

[20] *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).